IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ELLIS F. LALAU, | ) | CIVIL NO. 11-268 SOM/RLP |
| | ) | |
| Plaintiffs, | ) | ORDER GRANTING IN PART, |
| | ) | DENYING IN PART DEFENDANT'S |
| vs. | ) | MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| CITY AND COUNTY OF HONOLULU, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART, DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.        **INTRODUCTION.**

In this employment discrimination case, Plaintiff Ellis
Lalau is suing the City and County of Honolulu (the "City") in
connection with having been allegedly demoted, excluded from
training and meetings, investigated, and placed on administrative
leave from the Honolulu Liquor Commission.  Lalau asserts five
claims against the City.  Count I asserts national origin
discrimination in violation of Title VII.  Count II asserts a
claim under the Age Discrimination in Employment Act ("ADEA").
Count III asserts a state-law employment discrimination claim
pursuant to section 378-2 of Hawaii Revised Statutes.  Count IV
asserts a state-law whistleblower claim pursuant to section 378-
62 of Hawaii Revised Statutes.  Finally, Count V asserts a common
law claim for intentional infliction of emotional distress
("IIED").

The City now moves to dismiss Laulau's claims on the grounds that Laulau has failed to prosecute the case.  In the alternative, the City moves for summary judgment.  This court declines to dismiss the case for failure to prosecute.  After having earlier expressed its inclination to grant summary judgment to the City on all claims, the court, having heard oral argument, having further reviewed the written materials submitted to it, and having done further legal research, now concludes that questions of fact preclude summary judgment on several claims. Summary judgment is granted in the City's favor on only the following:

1.   The portions of the Title VII, ADEA, and section 378-2 claims asserting or a hostile work environment or retaliation.

2.   The entirety of Count IV.

3.   The portions of Count V asserting emotional distress relating to a hostile work environment, retaliation, or whistleblowing.

In all other respects, the summary judgment motion is denied.

**II.       BACKGROUND.**

Lalau is a Samoan male over the age of forty.  <u>See</u> Charge of Discrimination, Exh. M to Defendants' Concise Statement of Facts ("DCSF"), ECF No. 31-19.  He began working for the

Honolulu Liquor Commission as a liquor investigator in March 2007.  Id.

The parties agree that Lalau was temporarily assigned to fill the position of acting supervisor on December 12, 2007. See DCSF ¶ 5; Plaintiff's Concise Statement of Facts ("PCSF") ¶ 5, ECF No. 47.  Then, on March 26, 2008, Liquor Inspector Jude Remotigue complained that Lalau had belittled him and created a hostile work environment.  DCSF ¶ 7; PCSF ¶ 7.  The parties agree that shortly thereafter, in April 2008, Lalau ceased to be an acting supervisor and returned to being an investigator. However, the parties disagree as to the reason for that change in position.  The City says that the term of Lalau's temporary assignment simply ended.  Lalau contends that he was removed from his temporary assignment "in retaliation," because he was "about to report misconduct by Jeff Smith, other supervisors, and co-employees," and because he "refused to falsify" Daily Activity Reports, which Lalau alleges Chief Investigator Jeffrey Smith had directed him to do.  DCSF ¶¶ 9, 10; Dec. of Ellis V. Lalau ¶¶ 5, 10, ECF No. 47-2.

According to Lalau, in the period immediately following his return to being an investigator, he "was constantly harassed by Smith and [Administrator Dewey] Kim" and "excluded from meetings."  Lalau says that he "was accused of falsifying reports" and of "covering up for liquor establishments," and "was

threatened with polygraphs and future investigations." Dec. of
Lalau ¶ 11.  Lalau specifically recalls that, on June 16, 2008,
Smith told him that he could no longer participate in the Cancer
Research Center of Hawaii's program because he had missed a
meeting, even though other investigators who had missed meetings
had allegedly not been excluded from the program.  Id. ¶ 14.

       In mid-June 2008, Lalau asked Smith to reinstate him as
a supervisor.  Lalau says that Smith responded by saying that the
supervisory position would be going to "a younger guy as I was
too old anyway." Id. ¶ 11.  Smith denies having made any such
statement.  Dec. of Jeffrey Smith ¶ 35, ECF No. 31-16.
Administrator Kim notes that, at the time Lalau was removed from
the supervisory position, Lalau "was 41 years old," which was
younger than either Smith or Kim, and was "the youngest person in
a supervisory capacity."  Declaration of Dewey Kim
¶¶ 36-37.

       Lalau further says that, on June 19, 2008, "Smith and
Kim stated that they needed to make the office safe from me
because I was just a typical Samoan." Dec. of Lalau ¶ 13.  Smith
denies having made such a statement.  Dec. of Smith ¶ 39.  With
respect to whether Kim made such a statement, the court notes
that the reference in Lalau's declaration to Kim's having made
such a statement himself is at odds with the allegation, made
under penalty of perjury, in Lalau's administrative Charge of

Discrimination, which states, "Smith told Administrator Dewey Kim that he needed to make the office safe from me because I was Samoan and I was a 'typical Samoan.'" See Exhibit M, ECF No. 31-19. This discrepancy may reflect on Lalau's credibility at trial, but it is not material to the court's ruling here.

While not directly addressing the allegation that he himself made the statement, Kim denies that Smith made the statement to him and asserts that he would not have tolerated such a statement from Smith and that he himself harbors no animosity toward Samoans:

> 40. Plaintiff bases his claim of racial basis on the allegation that, in mid-June, Smith supposedly told me that "he needed to make the office safe from [Plaintiff] because Plaintiff was Samoan and a 'typical Samoan'."
>
> 41. Smith never made such a statement to me.
>
> . . . . .
>
> 45. If Smith had made such a derogatory statement, I would have considered it inappropriate, and would have counseled him about it.
>
> 46. I do not harbor any prejudice against, or animosity towards, Samoans and as Administrator took affirmative actions to hire more Polynesians at the Liquor Commission, including Samoans.

Dec. of Kim ¶¶ 40, 41, 45-46.

There is an additional inconsistency relating to what was said about Lalau's Samoan background. In a letter dated July

29, 2008, to the City's Director of Budget and Fiscal Services, Mary Pat Waterhouse, Lalau said that Smith had made "public comments around me that he 'needs to make this place (Honolulu Liquor Commission Office) safe from me because I placed Remotigue in a hostile working environment.'"  ECF No. 47-3.  Without saying that Smith had actually used the word "Samoan," the letter continues with the following parenthetical:  "(I felt comment was made due to my ethnic background)."  At trial, it may be critical to the factfinder to determine whether there was an express reference to Lalau as a "typical Samoan" or whether, without hearing the word "Samoan," Lalau was justified in "feeling" that the comment related to his "ethnic background."  This court need not resolve this matter and instead views the evidence in the light most favorable to Lalau, which means that the court accepts the version more damaging to the City (i.e., the version in which Lalau says that he was referred to as a "typical Samoan" from whom the office needed to be made safe).

In July 2008, following an internal investigation, Lalau received a Notice of Disciplinary Action that contained a written warning for having violated the Honolulu Liquor Commission's standards of conduct in his interactions with Remotigue.  See DCSF at Exhibit C, ECF No. 31-10.  Lalau says that, a few days later, Smith told him that he could no longer

participate in firearms training because he had missed a day, "when in fact I had never missed a day." Id. ¶ 16.

Smith and Kim deny that Lalau was excluded from training. They attribute any lack of training to Lalau's own decision not to take advantage of training opportunities. They refer to a training opportunity on Maui in September 2008, which they say Lalau declined because he planned to attend a football game on the mainland. Dec. of Kim ¶¶ 51-57; Dec. of Smith ¶¶ 46-50. Kim also says that, while Lalau did attend training in Kona, Lalau declined to attend training in California in 2008, citing childcare issues. Dec. of Kim ¶ 55. Smith and Kim say that the only training Lalau was not allowed to participate in was a firearms training session in late July 2008. Russell Yap, a Liquor Control Investigator I at the time of the events in question, was present for that training. He says that, because Lalau "appeared to be upset, agitated and accusatory," the firearms instructor and Yap, "[o]ut of concern for the safety of the other individuals participating in the exercise, . . . recommended that Plaintiff not participate in the live fire training." Dec. of Russell Yap ¶¶ 34-36. Smith concurred in that recommendation. Dec. of Smith ¶¶ 43-45.

Kim reports having held a meeting on July 29, 2008, that Kim says Lalau "burst" into "uninvited." Kim says he was meeting with three investigators and their temporary supervisor

"to share with them positive feedback [he] had received about their performance while training in California."  He says he had not invited Lalau or other investigators to that meeting "[g]iven the subject nature of the meeting."  Dec. of Kim ¶¶ 64-66. Lalau, on the other hand, told Mary Pat Waterhouse that everyone else who was at work that day was "in or headed to" the meeting. ECF. No. 47-3.  Kim says that Lalau demanded to know why he had not been invited to attend the meeting and that, when Kim explained that the meeting concerned training in California that Lalau had not participated in, Lalau accused him of threatening Lalau, told secretaries that they had to be Lalau's witnesses, and called the police.  Kim denies having threatened Lalau and says that the police determined that there had been no threatening conduct.  Id. ¶¶ 70-76.

That same day, Lalau submitted letters to the Liquor Commission Board and to Waterhouse, the City's Director of Budget and Fiscal Services, asserting that he had been subjected to a hostile work environment.  About two weeks later, Lalau was placed on administrative leave and "was officially charged and placed under investigation for performance of duty, absence of duty, and falsifying" Daily Activity Reports.  Dec. of Lalau ¶¶ 17-18, 21.  Lalau apparently remained on administrative leave until June 29, 2010.  According to Lalau, the charges against him were dismissed after having been "allowed to languish for 22

months." See letter from Lalau to Honolulu Liquor Commission
dated Sept. 24, 2010, ECF No. 47-4; letter from Lalau to
Commissioners dated June 1, 2011, ECF No. 47-5.

On September 3, 2008, Lalau filed his Charge of
Discrimination with the Hawaii Civil Rights Commission ("HCRC").
A box on the charge form that provided for simultaneous
presentation of the charge to the EEOC was checked. See Kaulia
v. County of Maui, 504 F. Supp. 2d 969, 985-86 (D. Haw.
2007)(noting that Hawaii is a deferral state with a worksharing
agreement between the EEOC and HCRC). The charge alleged
national origin and age discrimination, as well as retaliation.
ECF No. 31-19. On July 14, 2010, a Notice of Suit Rights was
mailed to him by the EEOC. ECF No. 31-20. Compl. ¶ 41. Nothing
in the record establishes that Lalau received a separate Right to
Sue Notice from the HCRC, which is required before a lawsuit
asserting a section 378-2 claim may be filed. See Haw. Rev.
Stat. §§ 368-11, 368-12. However, because there is no dispute
that Lalau submitted a charge to the HCRC, and because the City
does not contend on the present motion that Lalau failed to
exhaust his administrative remedies with respect to his section
378-2 claims, this court proceeds here on the assumption that
Lalau received a Right To Sue Notice from the HCRC.

Lalau filed suit in state court on October 10, 2010,
but did not serve the Complaint on the City. Lalau then filed

his First Amended Complaint on January 31, 2011, which was served on the City on April 11, 2011.  The City removed the action to this court on April 21, 2011.  <u>See</u> Notice of Removal of Civil Action, ECF No. 1.

**III.      THE COURT DECLINES TO DISMISS THIS ACTION FOR FAILURE TO PROSECUTE.**

The City seeks dismissal of this action based on what it says is Lalau's failure to prosecute this action.  Rule 41(b) of the Federal Rules of Civil Procedure provides for a motion to dismiss if a plaintiff "fails to prosecute or to comply with these rules or a court order."  "Dismissal is a harsh penalty and is to be imposed only in extreme circumstances."  <u>Henderson v. Duncan</u>, 779 F.2d 1421, 1423 (9th Cir. 1986).  A court must weigh several factors in determining whether to dismiss for lack of prosecution: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions."  <u>Id</u>.

The first factor (the public's interest in expeditious resolution of litigation) weighs in favor of dismissal.  This lawsuit commenced in state court in October 2010, and it has been nearly two years since the case was removed to this court.

The second factor (the court's need to manage its docket) is neutral, as the record does not indicate that the

10

court's management of its docket has been thwarted.  Of course, the more quickly a case progresses, the better from a case management point of view, and deadlines have undeniably been extended and trial continued.  Still, trial is set for next month, and the City does not show that that schedule is not within the normal range.

With respect to the third factor (the risk of prejudice to the City), the City points to a delay in service of the First Amended Complaint.  Lalau can hardly complain that the delays were caused by lack of knowledge of where to serve the City, a matter no doubt known to Lalau or his counsel before this lawsuit even began, or easily ascertained.  That does not mean, however, that the delay was unreasonable.  Indeed, because the record is devoid of evidence going to the reasons for that delay, the court is unable to label the delay unreasonable.  Delay alone will not support dismissal.  "A dismissal for lack of prosecution must be supported by a showing of <u>unreasonable</u> delay."  <u>Id</u>. (emphasis added).

Also in connection with the third factor, the City complains that Lalau did not respond to discovery requests for months, and that this delay "forced" the City to file the present motion "without the benefit of discovery."  Motion at 4, ECF No. 30-1.  The City does not indicate why it did not seek to compel discovery responses under Rule 37 of the Federal Rules of Civil

Procedure.  Moreover, while the court certainly understands that a deposition is likely to be more efficient and more comprehensive if the deposing party has discovery responses in hand, nothing prevented the City from noticing any deposition. Having not availed itself of remedies available to it that might have alleviated any prejudice, the City is not persuasive in contending that the risk of prejudice weighs in its favor.  At best, the City cites Henderson for the proposition that unreasonable delay creates a presumption of injury to the defense.  See id.  However, even assuming that not answering discovery requests for months is necessarily unreasonable, unreasonable delay does not always require dismissal.  See Mir v. Fosburg, 706 F.2d 916, 919 n.2 (9th Cir. 1983).  That is, while unreasonable delay creates a presumption of prejudice, such presumed prejudice, even unrebutted, does not compel a court to dismiss an action.

The fourth factor (the public policy favoring disposition on the merits) clearly would not be served by dismissal for failure to prosecute.

As to the fifth factor (the availability of less drastic sanctions), an obviously lesser sanction is strict enforcement of deadlines that have passed, meaning that Lalau must proceed without the benefit of information that more diligent prosecution of this case would have provided.

The above factors do not all fall on the same side of the scale, but, considered in combination, weigh against dismissal.  The court denies the motion to dismiss for failure to prosecute and turns to the City's alternative request for summary judgment.

IV.      **SUMMARY JUDGMENT STANDARD.**

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on

13

file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987. "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury

14

could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." <u>Miller</u>, 454 F.3d at 988 (quotation marks and brackets omitted).

**V.       ANALYSIS OF SUMMARY JUDGMENT ISSUES.**

> **A.   Lalau Provides Evidence of National Origin and Age Discrimination.**

>> **1.   Lalau Need Not Use the <u>McDonnell Douglas</u> Framework.**

In Count I, Lalau, who is Samoan, alleges that the City discriminated against him on the basis of his national origin in violation of Title VII of the Civil Rights Act of 1964.  Title VII prohibits employment discrimination based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

In Count II, Lalau asserts that the City discriminated him on the basis of his age, in violation of the ADEA.  The ADEA makes it unlawful to discriminate in employment against any individual who is at least 40 years old "because of such individual's age."  29 U.S.C. § 623; <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1281 (9th Cir. 2000).

In Count III, Lalau asserts employment discrimination by the City in violation of the state-law analogues to Title VII and the ADEA.  Section 378-2 of Hawaii Revised Statutes prohibits discrimination based on "race, sex, including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status."  Haw. Rev. Stat. § 378-2. This court treats the Title VII claim of national origin discrimination as analogous to a section 378-2 claim of discrimination based on race or ancestry.  For that reason, the court in this order sometimes refers to national origin discrimination under both Title VII and section 378-2 as a kind of shorthand intended to include race or ancestry discrimination under section 378-2.

In Counts I, II, and III, Lalau is clearly asserting disparate treatment by the City.  Lalau suffered disparate treatment if he was "singled out and treated less favorably than others similarly situated on account of" his national origin or race.  See Gay v. Waiters' & Dairy Lunchmen's Union, 694 F.2d 531, 537 (9th Cir. 1982).  A plaintiff who asserts disparate treatment in employment may prove that he has a triable claim in either of two ways.

First, the plaintiff may apply the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

16

792 (1973).  This analysis applies equally to claims brought under Title VII, the ADEA, and section 378-2.  See <u>Shelley v. Green</u>, 666 F.3d 599, 607-08 (9th Cir. 2012) (noting that the <u>McDonnell Douglas</u> burden-shifting framework applies to ADEA claims evaluated in the context of a summary judgment motion); <u>Surrell v. Cal. Water Serv. Co.</u>, 518 F.3d 1097, 1103 (9th Cir. 2008) (applying <u>McDonnell Douglas</u> burden-shifting framework to Title VII case); <u>Shoppe v. Gucci Am., Inc.</u>, 94 Haw. 368, 378, 14 P.3d 1049, 1059 (2000) (applying federal analysis to claims under section 378-2).

Under the <u>McDonnell Douglas</u> framework, a plaintiff must establish a prima facie case of discrimination by showing that (1) he belongs to a protected class; (2) he performed according to his employer's expectations; (3) he suffered an adverse employment action; and (4) similarly situated individuals outside of his protected class were treated more favorably.  See <u>Nicholson v. Hyannis Air Serv., Inc.</u>, 580 F.3d 1116 (9th Cir. 2009); <u>Chuang v. Univ. of Cal. Davis Bd. of Trustees</u>, 225 F.3d 1115 (9th Cir. 2000).  The degree of proof required to establish a prima facie case for summary judgment is minimal.  See <u>Coghlan v. Am. Seafoods Co.</u>, 413 F.3d 1090, 1094 (9th Cir. 2005).

Under the <u>McDonnell Douglas</u> framework, once a plaintiff succeeds in presenting a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory

reason" for its employment decision.  <u>Noyes v. Kelly Servs.</u>, 488
F.3d 1163, 1168 (9th Cir. 2007).  "Should the defendant carry its
burden, the burden then shifts back to the plaintiff to raise a
triable issue of fact that the defendant's proffered reason was a
pretext for unlawful discrimination."  <u>Id.</u>

    Second, a plaintiff may opt not to rely on the
<u>McDonnell Douglas</u> framework at all in responding to a summary
judgment motion.  He may instead respond by producing evidence
demonstrating that a discriminatory reason more likely than not
motivated his employer.  <u>See Surrell</u>, 518 F.3d at 1105; <u>McGinest
v. GTE Service Corp.</u>, 360 F.3d 1103, 1122 (9th Cir. 2004)(a
plaintiff responding to a summary judgment motion may "proceed by
using the <u>McDonnell Douglas</u> framework, or alternatively, may
simply produce direct or circumstantial evidence demonstrating
that a discriminatory reason more likely than not motivated" the
employer).  When a comment is not a "stray remark," even if the
employer has a legitimate, nondiscriminatory reason for taking an
adverse employment action, the plaintiff "will <u>necessarily</u> have
raised a genuine issue of material fact with respect to the
legitimacy or bona fides of the employer's articulated reason for
its employment decision."  <u>Cordova v. State Farm Ins. Co.</u>, 124
F.3d 1145, 1149 (9th Cir. 1997) (quotation marks and citation
omitted).

In its moving papers, the City relies primarily on the McDonnell Douglas burden-shifting framework, arguing that Lalau cannot meet his initial burden under that framework of making out a prima facie case.  But Lalau eschews the McDonnell Douglas framework and opts to go directly to producing evidence that the City likely acted for a discriminatory reason.  Lalau's approach is clearly permitted.

"[A]lthough the McDonnell Douglas burden shifting framework is a useful 'tool to assist plaintiffs at the summary judgment stage so that they may reach trial,' 'nothing compels the parties to invoke the McDonnell Douglas presumption.'"  McGinest, 360 F.3d at 1122 (quoting Costa v. Desert Palace, 299 F.3d 838, 855 (9th Cir. 2002)(en banc), aff'd, 539 U.S. 90 (2002)).

### 2. Lalau's Evidence of National Origin and Age Discrimination Is Sufficient To Preclude Summary Judgment.

The evidence that Lalau produces to show that a discriminatory reason more likely than not motivated the City is as thin as it could be.  That evidence may end up being too thin to support a verdict at trial.  But even that slight evidence is sufficient to defeat the City's summary judgment motion.

The evidence going to national origin discrimination consists of a single alleged comment.  The comment, allegedly made by Smith and/or Kim on June 19, 2008, reportedly referred to a

19

need "to make the office safe" from Lalau because Lalau was "a typical Samoan." <u>See</u> Dec. of Lalau ¶ 13.

Similarly, the evidence going to age discrimination consists of a single comment. Lalau says that, in mid-June 2008, he asked to be reinstated as a supervisor, but that Smith told him that the supervisory position would be going to "a younger guy as I was too old anyway."

Smith and Kim were the very individuals responsible for ending Lalau's assignment as an acting supervisor.[1]  Although the separate comments were both allegedly made after Lalau was removed from his position as acting supervisor in April 2008, it is reasonable to infer that comments made about Lalau's being Samoan or being too old in June 2008 reflected the attitudes Smith and Kim had when Lalau lost his supervisory position. <u>See</u> <u>Cordova</u>, 124 F.3d at 1149 (statements made after an employer decided not to

---

[1] The City says, "Smith and Kim were responsible for both Plaintiff's hiring and alleged discrimination."  Motion at 16. The City's statement relates to its argument that it is entitled to the benefit of the "same actor" inference.  Motion at 16.  The Ninth Circuit has stated, "We therefore hold that where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270-71 (9th Cir. 1996).  As to the Ninth Circuit's reference to a "a short period of time," this court notes that <u>Bradley</u> involved a gap of a year between the plaintiff's hiring and firing, although there were extensions of the probationary period in the interim.  Lalau lost his supervisory position about a year after he was hired.  However, the "same actor" inference is rebuttable, <u>see</u> <u>id</u>., and Lalau attests to post-hiring comments by Smith and/or Kim about national origin and age.

hire the plaintiff could be evidence that discrimination influenced the decision).

Two matters merit emphasis here.

First, Lalau's inability to identify more than a single comment relating to his being Samoan and a single comment relating to his age is not fatal to his claims of national origin discrimination and age discrimination.  The Ninth Circuit has noted, "[I]n this circuit, we have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer."  Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1039 (9th Cir. 2005).  "Where, as here, the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision."  Id. 1039-40.  Such evidence is "sufficient to overcome summary judgment."  Id. at 1040 n.5.  Accord Metoyer v. Chassman, 504 F.3d 919, 937 (9th Cir. 2007).

Relying on a supervisor's discriminatory single comment is consistent with "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."  McGinest, 360 F.3d at 1112.  If this court were to

21

grant summary judgment too readily, it would "run[] the risk of providing a protective shield for discriminatory behavior that our society has determined must be extirpated." Id. Of course, this court is not here suggesting that the City has actually engaged in discriminatory behavior.  This court is only determining that it cannot, on the present record, determine that the City is entitled to judgment in its favor on the disparate treatment claims under Title VII, the ADEA, and section 378-2.

The second matter that bears noting is that the comments are direct evidence of discriminatory animus toward Samoans and older workers.  "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." Brown v. E. Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (9th Cir. 1993).  The alleged comment about needing to make the office "safe" from Lalau because he is a "typical Samoan" reflects a belief that Samoans typically present some form of danger to others.  Assuming Smith and/or Kim actually made the comment, which they dispute, it requires no inference that Smith and/or Kim had a negative attitude toward Samoans; the comment itself illustrates such an attitude.  By contrast, if, contrary to what Kim says in his declaration, no Samoans had been hired, that would be circumstantial, not direct, evidence of a discriminatory mindset.

It is the direct indication of bias in the alleged comments that prevents them from being relegated to "stray

remarks" that are insufficient to sustain a plaintiff's claim.
See Chuang, 225 F.3d at 1128(noting that direct evidence of
discriminatory motive need not be substantial and may be "very
little" to create a triable issue).  A supervisor's comment that
patently reveals a discriminatory mindset is not "stray" in the
context of an employment discrimination action.  Indeed, the
comment need not even be made in the direct context of an adverse
employment decision to establish discrimination.  See Reeves v.
Sanderson Plumbing Prod., Inc., 530 U.S. 133, 153 (2000).

Of course, direct evidence that Smith and Kim had a
discriminatory mindset toward Samoans is not necessarily the same
as direct evidence that Smith and Kim subjected Lalau to any
adverse employment action because of that discriminatory mindset.
One adverse employment action identified by Lalau is his alleged
demotion from the acting supervisor position, an action the City
says reflected only the temporary nature of his initial assignment
to that position.  The court views this dispute about why Lalau
lost his supervisory position as a matter for the jury to resolve,
but for purposes of this motion, views the facts in Lalau's favor.
Lalau also claims to have been excluded from meetings and denied
training, including firearms training, and to have been subjected
to investigations that caused him to be placed on administrative

23

leave.[2]  The connection between the direct evidence of
discriminatory mindset and any adverse employment action is
circumstantial, not direct.   Such evidence includes the relatively
short period separating the "typical Samoan" comment from Lalau's
loss of the supervisory position.   It also includes the alleged
exclusion of Lalau from meetings.   One might see that alleged
exclusion as an indication that Smith and Kim preferred not to
associate with Lalau and to wall him off from opportunities to
advance.   Assuming a jury found that Smith and Kim made the
alleged "typical Samoan" comment, the jury could also find from
the circumstantial evidence that their distaste for Samoans
influenced actions they took affecting the conditions of Lalau's
employment.

       In differentiating between direct and circumstantial
evidence, this court is engaging in an exercise not uncommon to
courts and parties in employment discrimination cases.   See, e.g.,

---

       [2] Some of the things Lalau complains about may not rise to
the level of adverse employment actions.  For example, the record
does not include enough information for the court to understand
whether participation in the Cancer Research Center of Hawaii
program was an employment benefit or unrelated to the conditions
of employment.   It is similarly unclear whether the alleged
exclusion from the meeting of July 29, 2008, was an adverse
employment action.   Lalau presents no detail as to what important
or necessary information or fellowship he might have been
deprived of by the alleged exclusion.   Because the City's motion
does not dispute that Lalau did suffer an adverse employment
action and does not attempt to narrow the events qualifying as
adverse employment actions, the court does not here parse the
allegations to determine which events do qualify.

McGinest, 360 F.3d at 1122 ("The parties debate at length the question of whether McGinest adduced direct or circumstantial evidence of discrimination, and the relevance of the resolution of this question to the proper analytical framework by which a disparate treatment claim is evaluated."). Such efforts flow from concern that the applicable standard be applied in evaluating the evidence. The Ninth Circuit has said that, when a plaintiff opts not to rely on the McDonnell Douglas framework but instead to produce evidence that an employer likely acted for a discriminatory reason, it does not matter whether the evidence is direct or circumstantial. Thus, in McGinest, the Ninth Circuit said, "In Costa, the Supreme Court held that circumstantial and direct evidence should be treated alike, noting: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" 360 F.3d at 1122. However, the Ninth Circuit has also said that "[o]ur circuit has not clearly resolved" whether, when evidence of discriminatory animus is circumstantial, the evidence must be "specific" and "substantial," a standard inapplicable to direct evidence. Davis v. Team Elec. Co., 520 F.3d 1080, 1091 (9th Cir. 2008).

After the Supreme Court decided Costa in 2002, the Ninth Circuit, in Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006), said that "in the context of summary

judgment, Title VII does not require a disparate treatment
plaintiff relying on circumstantial evidence to produce more, or
better, evidence than a plaintiff who relies on direct evidence."
But in other post-Costa cases, the Ninth Circuit required
circumstantial evidence of pretext to be "specific" and
"substantial."  Davis, 520 F.3d at 1091 n.6 (citing Dominguez-
Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005),
as an example of a case in which the higher standard was
required).  Thus, when a plaintiff's evidence is circumstantial, a
court may have to determine whether the evidence is specific and
substantial.

        Lalau's evidence of national origin discrimination is a
hybrid.  He has direct evidence of discriminatory animus but
circumstantial evidence that the animus influenced an adverse
employment action.  Even if a hybrid is treated as entirely
circumstantial, Lalau offers evidence from which a jury could
infer that animus toward Samoans influenced the City's actions.
In so concluding, this court relies heavily on Davis.

        In Davis, the employer argued that comments the
plaintiff was relying on to show pretext were not actually
evidence of pretext.  The pretext analysis under the McDonnell
Douglas framework has much in common with analysis of evidence a
plaintiff offers to show that an employer probably acted for a
discriminatory reason.  See McGinest, 360 F.3d at 1113 (noting the

26

parallel and stating that "it is not particularly significant" whether a plaintiff is seeking to show pretext under the McDonnell Douglas framework or relying on direct or circumstantial evidence of discriminatory intent).  Accordingly, this court finds the discussion in Davis about the pretext evidence instructive here.

The employer in Davis argued that certain comments were not direct evidence of pretext, noting that, among other things, they were not clearly sexist, insulting, humiliating, intimidating, derogatory, or threatening.  The Ninth Circuit said, "This is not an unreasonable interpretation of the comments, but it would also be reasonable for a jury to infer otherwise."  520 F.3d at 1092 n.7.  The court went on to say, "If the statements are not direct evidence of pretext, they are at the least circumstantial evidence from which a jury could infer pretext." Id.  The court then immediately quoted Dominguez-Curry for the proposition that "a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer."  Id.  Because this discussion in Davis is very near to a discussion about the confusion over whether "specific" and "substantial" circumstantial evidence is required, it appears to this court that the Ninth Circuit's point was that, even if a plaintiff is relying on circumstantial evidence, a single discriminatory comment will pass the "specific and substantial" standard if it is made by the plaintiff's supervisor

or by a person who makes a decision as to an adverse employment action.

Treating Lalau's evidence relating to national origin discrimination as "specific" and "substantial," this court concludes that Lalau raises questions of fact as to his claims of disparate treatment based on national origin in violation of Title VII and section 378-2.  The City's request that summary judgment be entered in its favor on those claims is therefore denied.

With respect to the claims of disparate treatment based on age, the evidence is entirely direct.  The alleged comment about age not only reflected a negative attitude toward older workers, it indicated an intent to fill Lalau's former supervisory position with a younger person because Lalau was simply "too old." The alleged comment was very much like an alleged comment addressed by the Ninth Circuit in Dominquez-Curry, 424 F.3d at 10-38-39.  The comment in that case was a statement that a decisionmaker intended to hire a man to fill a position that the plaintiff, a woman, had applied for.  The Ninth Circuit said the comment "cannot be deemed ambiguous," even though the plaintiff could not provide "specifics" about when the comment was made. The lack of detail might affect a jury's credibility determination, but "[a]s long as a reasonable factfinder could conclude that discrimination occurred, summary judgment must be denied."  Id. at 1039.

This court therefore also denies summary judgment as to the claims of disparate treatment based on age brought under the ADEA and section 378-2.

### B.   Lalau May Not Proceed with a Hostile Work Environment Claim.

In opposing the City's motion, Lalau mentions but does not elaborate on a "hostile work environment."  It is not clear whether he is asserting a hostile work environment under Title VII, the ADEA, or section 378-2.  Nor does the First Amended Complaint contain factual allegations that support a hostile work environment claim under any of those statutes.  Even if Lalau is indeed making a hostile work environment claim, the court grants summary judgment to the City in that regard.

The employment discrimination statutes under which Lalau proceeds recognize claims that an employee was subjected to a hostile work environment.  See, e.g., Harris v. Forklift Sys. 510 U.S. 17, 21-22 (1993) (hostile work environment claim cognizable under Title VII), Sischo-Nownejad v. Merced Cmty Coll. Dist., 934 F.2d 1104, 1109 (9th Cir. 1991) (hostile work environment claim cognizable under ADEA); Nelson v. Univ. of Haw., 97 Haw. 376, 38 P.d 3d 95, 106 (2001) (hostile work environment claim cognizable under section 378-2).

A plaintiff claiming to have been subjected to a hostile work environment must show that the "workplace was permeated with discriminatory intimidation that was sufficiently severe or

29

pervasive to alter the conditions of . . . employment and create an abusive working environment." <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 923 (9th Cir. 2000).  The showing must satisfy both subjective and objective requirements; that is, the plaintiff must show that the plaintiff perceived the work environment to be hostile, and that a reasonable person in the plaintiff's position would have perceived it as hostile.  <u>Id</u>.  The plaintiff must also prove that the hostility related to something prohibited by the applicable employment discrimination statute.  Thus, for example, a plaintiff claiming to have been subjected to a work environment that was hostile because it was permeated with sexually harassing comments or conduct must show that the harassment occurred "because of" the plaintiff's sex.  <u>Id</u>.; <u>Nichols v. Azteca Rest. Enter</u>., 256 F.3d 864, 874 (9th Cir. 2001).

As noted earlier in the present order, Lalau reports a single comment relating to his national origin, and a single comment relating to his age.  While such evidence may support a disparate treatment claim, it is too sparse to support a claim that the workplace was "permeated" with hostility sufficiently "severe" or "pervasive" to alter the conditions of his employment.

The court notes that Lalau repeatedly refers in his declaration to having been subjected to a "hostile work environment."  He appears to use that term very loosely to include

30

any situation involving hostility or aggression, not just situations relating to national origin or age.

For example, in his declaration, Lalau says, "From December 2007, the end of my probationary period, I began vocally expressing concern that Smith and Kim were creating a hostile work environment.  I also expressed concern regarding Smith's mismanagement within the office, namely that he was encouraging me falsify the DAR."  Dec. of Lalau ¶ 19.  December 2007 was about half a year before the alleged comments about Samoans and age. There is no evidence that Lalau was subjected to anything in the workplace relating to being Samoan or 40 or older beginning in December 2007.

He also describes correspondence he sent as having "complain[ed] of a hostile work environment."  Id. ¶ 21.  In the letter he sent to Waterhouse on July 29, 2008, he does indeed use the term "hostile work environment."  He also includes a reference to the single comment that he felt "was made due to my ethnic background."  See letter from Lalau to Mary Pat Waterhouse dated July 29, 2008, ECF No. 47-3.  However, Lalau also refers to the accusation that he himself had "placed Remotigue in a hostile working environment" when he allegedly "yelled at him."  There is no evidence that Lalau's interactions with Remotigue were influenced by Remotigue's race, sex, national origin, age, or other protected characteristic, or that Lalau was accused of

31

having discriminated against Remotigue on any such basis. Lalau's letter says that Kim swore at him, and on one occasion "got off of his chair and came at me and I felt intimidated, frightened and harassed by his conduct." The letter concludes by saying that Smith and Kim "have placed me in an extremely hostile working environment." The overall sense one gets from the letter is that, for Lalau, "hostile work environment" is not a term of art restricted to contexts involving discrimination based on a protected characteristic.

Because, notwithstanding Lalau's use of the term "hostile work environment," Lalau provides no evidence establishing that his workplace was permeated with discriminatory intimidation relating to his national origin or his age, summary judgment is granted to the City with respect to any "hostile work environment" claims he may have been trying to assert under Title VII, the ADEA, or section 378-2.

## C. Summary Judgment is Granted in Favor of the City with Respect to Lalau's Retaliation Claims.

In Counts I, II, and III, Lalau also asserts that the City retaliated against him in violation of law. Title VII makes it unlawful for an employer to retaliate against an employee on the basis of the employee's opposition to practices or actions prohibited by Title VII. See 42 U.S.C. § 2000e-3(a). The ADEA similarly protects from retaliation an employee who has opposed age discrimination, or participated in investigations,

32

proceedings, or litigation concerning age discrimination.  <u>See</u> 29 U.S.C. § 626(d).  Similarly, section 378-2(2) makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited by this part."  <u>See</u> Haw. Rev. Stat. § 378-2(2).  That is, these retaliation provisions relate to retaliation against an employee who has engaged in some protected activity designed to address discrimination in the areas identified in Title VII, the ADEA, or section 378-2.

        Retaliation would be shown by evidence that Lalau engaged in protected activity, that he was thereafter subjected to an adverse employment action, and that there is a causal link between the protected activity and the adverse employment activity.  <u>See</u> <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 891 (9th Cir. 1994).  Lalau does not meet the requirement that he show at least some evidence going to each of those elements.

        First, the protected activity must be protected by the statutes Lalau sues under.  Lalau instead assumes that any report of wrongdoing, even wrongdoing that falls outside of what Title VII, the ADEA, and section 378-2 prohibit, supports a retaliation claim under Title VII, the ADEA, and section 378-2.  He is mistaken.

33

Lalau's error shows up in the way he defines what triggered the alleged retaliation against him.  For example, he says, "I was removed from the temporary assignment in retaliation because I was about to report misconduct by Jeff Smith, other supervisors, and co-employees; and because I refused to falsify the DAR."  Dec. Of Lalau ¶ 10.  Lalau repeats this assertion in his memorandum opposing the present motion, saying, "Plaintiff was removed from the T/A assignment in retaliation for engaging in protected activity–namely that Plaintiff was about to report Smith for misconduct, e.g. falsifying DAR, corruption, issuance of bogus citations to liquor establishments, and Smith knew it."  Opp. Memo at 6, ECF No. 46.  Even if Lalau's demotion was retaliatory, the retaliation allegedly related to his intent to report misconduct unrelated to his national origin or his age.  Because neither Title VII, the ADEA, nor section 378-2 protects an employee from being retaliated against for preparing to report bogus citations or falsification of a business record like a "DAR," Lalau's statement does not come close to satisfying the first element of his retaliation claim.

Similarly, even though Lalau says that he began "vocally expressing concern that Smith and Kim were creating a hostile work environment" beginning in December 2007, <u>see</u> Dec. of Lalau ¶ 19, that "hostile work environment," as noted earlier in this order, was not hostile in December 2007 because of national origin

discrimination or age discrimination.  The first evidence of such discrimination that Lalau reports being aware of were the comments allegedly made in June 2008.  Lalau could not have complained about or reported national origin discrimination or age discrimination before the comments were made.  That is precisely why, in his memorandum opposing the City's summary judgment motion, Lalau identifies the protected activity that triggered the alleged retaliation by the City as his "voicing concern and questioning the validity of citations issued to licensed premises."  Opp. Memo at 9, ECF No. 46.  Once again, such activity is not protected by Title VII, the ADEA, or section 378-2.

In terms of timing, the only City action identified by Lalau that has a remote possibility of having been retaliatory is the charge against him of August 13, 2008, which was accompanied by an investigation and his administrative leave designation.  The charge issued, and the investigation and leave did indeed begin, after the discriminatory comments were allegedly made.  However, even if timing does not render it impossible for administrative leave to have been imposed in retaliation for protected activity, the record does not permit the inference or conclusion that the retaliation related to Lalau's reporting of or opposition to national origin discrimination or age discrimination.

At most, Lalau points to having been placed on administrative leave about two weeks after he sent a letter to

Waterhouse, Director of Budget and Fiscal Services, on July 29, 2008.  That is the letter, discussed earlier, that referred to a "hostile working environment" and included the following parenthetical comment: "(I felt comment was made due to my ethnic background)."  ECF No. 47-3.  Nothing in that letter relates to age discrimination, so application of the ADEA's retaliation provisions could not possibly be based on that letter.    The court has read and reread this letter in an attempt to fairly evaluate the impact of that parenthetical.  The result is that the court concludes that nothing in the record establishes a causal link between the letter and the imposition of administrative leave or any related adverse employment action.

In the first place, there is no evidence that Smith and Kim saw the letter before Lalau was placed on administrative leave in August 2008.  They could not have retaliated in response to something they did not know about.

In the second place, the letter accuses them directly and forcefully of so many offensive, aggressive, and unjustified acts that it cannot be presumed without evidence that they zeroed in on the parenthetical or retaliated against Lalau based on the parenthetical.  Throughout the letter, Lalau purports to quote Smith and Kim making objectionable comments.  By contrast, the letter does not report that Smith or Kim made any express comment about Lalau's national origin.  The parenthetical only describes

36

Lalau's feeling, not their utterances on the subject. What Smith actually said is reported by Lalau immediately before the parenthetical: "Mr. Smith has made public comments around me that he 'needs to make this place (Honolulu Liquor Commission Office) safe from me because I placed Remotigue in a hostile working environment.'" The only connection between this alleged statement and national origin is Lalau's parenthetical about his feeling.

Added to the clear focus of the letter on matters other than Lalau's Samoan background, the use of parentheses serves to diminish the impact of the reference to Lalau's ethnic background. The reference appears as an aside, not as a request to a higher authority to root out discrimination.  Even if the letter's addressee should have read the letter as complaining about discrimination against Samoans, Lalau gives the court no reason to think that any retaliation by Smith and Kim was triggered by their reaction to being depicted as prejudiced against Samoans.

Conspicuously absent from the letter is the kind of direct evidence the court relied on in analyzing the disparate treatment claims.  That is, Lalau does not quote Smith as having said that he had to make the office safe because Lalau was a "typical Samoan."  The court notes this omission not in the interest of distinguishing direct evidence from circumstantial evidence, but rather because the retaliation provisions of Title VII and section 378-2 require a plaintiff to show not only that he

opposed discrimination (in this case, based on national origin) or participated in some way in a proceeding addressing such discrimination, but also that the protected activity caused the employer to punish the plaintiff.  The court's concern is therefore about how the letter was perceived by Smith and Kim, not about how someone seeking to address all of Lalau's concerns might have reacted.  Just as Lalau gives the court no evidence indicating that Smith and Kim even knew about the letter before the allegedly retaliatory imposition of administrative leave, Lalau gives the court no evidence of any connection between the letter and the alleged retaliation.

The manner in which "ethnic background" is mentioned makes it ancillary to Lalau's complaint that Smith was making decisions "while the investigation was still ongoing."  Lalau's real point is that "He made his own judgment and found me guilty before the verdict was actually handed down."  Lalau may have had multiple purposes for sending the letter, and combining a discrimination complaint with complaints about other matters does not nullify the discrimination complaint that a careful reader might discern from the letter.  But the court still requires some evidence that the parenthetical triggered a vengeful response from the employer. Lalau appears to be assuming from mere chronology that he shows causation.  Especially given the parenthetical presentation, the cursory nature of Lalau's reference to his

ethnic background, and the absence of evidence that Smith and Kim knew about the letter, chronology alone does not suffice to create a triable issue as to causation of retaliatory acts.

The court grants summary judgment to the City with respect to Lalau's retaliation claims.

### D. Lalau's WPA Claim Fails.

Count IV alleges that the City violated Hawaii's Whistleblowers' Protection Act ("WPA").  The WPA prohibits an employer from discriminating against an employee because the employee "reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of . . . [a] law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States."  See Haw. Rev. Stat. § 378-62.

The City asserts that this claim cannot proceed because it cannot reasonably be asserted that the WPA claim was exhausted. In contending that exhaustion of administrative remedies was required, the City relies on Judge Alan Kay's conclusion in Linville v. Hawai`i, 874 F. Supp. 1095, 1104 n.4 (D. Haw. 1994), that the WPA is subject to an exhaustion requirement, and that a plaintiff must obtain a Right To Sue Notice from the HCRC before asserting a WPA claim in court.  The attraction of this conclusion is that it recognizes the relationship between a retaliation claim

39

under section 378-2(2) and a WPA claim.  Requiring a WPA plaintiff to go to the HCRC to exhaust administrative remedies prevents a plaintiff who has failed to exhaust a retaliation claim under section 378-2(2) from escaping that failure by simply redesignating his retaliation claim as one under the WPA and filing it in court without ever going to the HCRC.

The court nevertheless recognizes that requiring exhaustion for a WPA claim raises some troubling issues.  First, no statute expressly requires a WPA claim to be exhausted.  Section 368-11(a) of Hawaii Revised Statutes gives the HCRC jurisdiction over claims of discrimination asserted under part I of chapter 378, which includes sections 378-1 to 378-10.  Section 368-11(c) requires a complaint of discrimination under section 378-2 to be filed with the HCRC within 180 days of the unlawful discriminatory practice or the last occurrence in a pattern of ongoing discrimination.  The WPA is in section 378-62, which is part of  part V of chapter 378.  No statutory language gives the HCRC jurisdiction over claims brought under section 378-62 or any other part of part V.  It is unclear what statutory language could be read to make section 368-11(c)'s exhaustion requirements applicable to the WPA.

There is, in addition, a practical problem with reading an exhaustion requirement into the WPA.  The WPA protects all whistleblowers, not just whistleblowers asserting violations of

40

employment discrimination laws.  The HCRC's jurisdiction and expertise relate to employment discrimination, not to all laws that might be the subject of whistleblowing.  For example, an employee fired for blowing the whistle on an employer's illegal dumping of hazardous waste would have a claim far outside the HCRC's normal areas of concern.  The same could be said with respect to an employee who was suspended after reporting that an employer was concealing taxable income.  It is hard to see the rationale for requiring exhaustion with the HCRC not only of claims relating to violations of part I of chapter 378, including section 378-2, but also of whistleblower claims unrelated to the forms of discrimination listed in part I.

The court's concern is not alleviated even if the City is assuming that the exhaustion requirement is limited to WPA claims that implicate a section 378-2 category.  Admittedly, such WPA claims would mirror retaliation claims falling under section 378-2(2), which would have to be exhausted.  However, limiting WPA exhaustion to claims relating to section 378-2 issues would require even more interpolation with respect to existing statutory language.  The court would not only have to read into Hawaii Revised Statutes an exhaustion requirement for WPA claims, it would have to then create exceptions to that implied requirement. Every WPA claim would then have to be dissected to determine whether exhaustion was or was not required.

41

Requiring exhaustion with the HCRC of section 378-62
claims would also be inconsistent with Judge David Ezra's
reasoning in Lesane v. Hawaiian Airlines, 75 F. Supp. 2d 1113 (D.
Haw. 1999).  In Lesane, the court held that Title VII's and
chapter 378's administrative processes do not toll the limitation
period for a section 378-62 claim.  Id. at 1125.  If the filing of
charges with the EEOC or HCRC does not toll the limitations period
for filing a whistleblower's claim under section 378-62, a WPA
plaintiff who must exhaust administrative remedies is in a very
difficult position.  Exhausting administrative processes before
filing a section 378-62 claim might risk running afoul of the two-
year statute of limitations in section 378-63.

        Fortunately for this court, while it has set forth
matters of concern relating to requiring exhaustion for section
378-62 claims, it need not here actually decide whether exhaustion
is required.  Lalau's WPA claim fails without regard to any
exhaustion requirement because it was not timely filed in court.

        A WPA claim must be brought within two years.  See Haw.
Rev. Stat. § 378-63 ("A person who alleges a violation of this
part may bring a civil action for appropriate injunctive relief,
or actual damages, or both within two years after the occurrence
of the alleged violation of this part.").  The City notes that,
even without section 378-63, a two-year limitation period would
likely apply.  See Linville, 874 F. Supp. at 1104 (applying the

42

general tort limitation period of two years set forth in Haw. Rev. Stat. § 657-7 to a WPA claim); <u>Silva v. City & County of Honolulu</u>, 115 Haw. 1, 165 P.3d 247 (2007)(discussing the effect of Haw. Rev. Stat. § 46-72 on the limitation period for tort claims against the City and concluding that the claims were governed by Haw. Rev. Stat. § 657-7).

Lalau originally filed this action in state court on January 31, 2011. The last adverse action that Lalau identifies as relevant to this lawsuit was taken against him by the City on August 13, 2008. First Amended Complaint ¶ 29. He took more than two years after that date to file suit. The WPA claim was therefore time-barred.

Lalau argues that the limitations period should be tolled while his related retaliation claims were being exhausted. But Lalau's WPA claim is independent of any retaliation claim under Title VII, the ADEA, or section 378-2. Moreover, this court rules in this very order that Lalau has no viable retaliation claim under Title VII, the ADEA, or section 378-2.

Even if not time-barred, the WPA claim fails because Lalau does not provide sufficient evidence to proceed to trial on his WPA claim. While the WPA does not explicitly set forth the elements of a claim under section 378-62, three elements can be extrapolated from its language:

> First, there must be a showing that the
> employee engaged in protected conduct as it is

> defined by the HWPA.  Second, the employer is
> required to take some adverse action against
> the employee.  Third, there must be a causal
> connection between the alleged retaliation and
> the whistleblowing.  In other words, to meet
> the causal connection requirement, the
> employer's challenged action must have been
> taken because the employee engaged in
> protected conduct.

Griffin v. JTSI, Inc., 654 F. Supp. 2d 1122, 1130-31 (D. Haw.

2008) (citations, quotation marks, and alterations omitted).  Even

assuming there is no dispute that Lalau has a triable issue as to

the first factor, he makes no showing that there is a triable

issue of fact with respect to the third factor, which is

causation.  As the court noted in discussing Lalau's retaliation

claims, Lalau does not provide evidence of a causal link between

any protected activity and any allegedly retaliatory act.

> **E.   The Part of Lalau's IIED Claim Based on Matters No
>       Long in Issue Fails.**

Count V alleges that the City's actions "constituted

intentional infliction of severe emotional distress."  To state a

claim for IIED, Lalau must show "1) that the act allegedly causing

the harm was intentional or reckless, 2) that the act was

outrageous, and 3) that the act caused 4) extreme emotional

distress to another."  Hac v. Univ. of Hawaii, 102 Haw. 92, 106-

07, 73 P.3d 45, 60-61 (2003).

Count V alleges that the City's actions "constituted

To the extent the court disposes of claims in this

order, Lalau may not base an IIED claim on those claims.  Thus,

Lalau may not proceed with an IIED claim asserting, for example,

an injury based on the City's purported retaliation in violation of the ADEA, as summary judgment is granted to the City on the ADEA retaliation claim.

The court permits Lalau to proceed with only the portion of Count V relating to matters that remain to be tried.

Evidence relating to the first two elements of an IIED claim will mirror (or supplement) the evidence required for Lalau to prevail on his remaining claims.  With respect to the last two elements, Lalau describes experiencing "migraine headaches, lack of sleep, constant worry, depression, [and] lack of sexual intimacy."  Id.  Lalau attributes these symptoms to the uncertainty surrounding his future employment, which he blames on the City's treatment of him.  Thus, he answered the City's interrogatory question, "Please describe any and all mental or emotional injuries to your person resulting from the events complained of in your Complaint," as follows: "Constantly stressed out due to being worried all the time because I do not know my future with the [L]iquor [C]ommission.  Being out on leave for nearly 34 months without knowing your future takes a toll mentally.  I am depressed."  Lalau's Ex. 7 at 10.

Lalau makes a showing sufficient to allow him to try his IIED claim to the extent it is tied to substantive claims that survive the present motion.

## VI.        CONCLUSION.

For the reasons stated above, to the extent Lalau asserts hostile work environment or retaliation claims in Counts I, II, and III, the court grants summary judgment to the City on those claims.  Summary judgment is also granted in favor of the City on the WPA claim asserted in Count IV.

With respect to Count V, the court grants summary judgment to the City with respect to the portion of Count V that asserts an IIED claim in connection with the hostile work environment, retaliation, or whistleblowing asserted in Counts I, II, III, and IV.  Summary judgment is denied with respect to all other claims.

This order leaves for trial the portions of Counts I, II, and III that assert disparate treatment, and the portion of Count V that asserts IIED relating to disparate treatment.

Lalau concedes that he may not recover punitive damages against the City, and his prayer for punitive damages is deemed withdrawn.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 28, 2013.



                              /s/ Susan Oki Mollway
                        SUSAN OKI MOLLWAY
                        CHIEF UNITED STATES DISTRICT JUDGE

Ellis F. Lalau v. City and County of Honolulu; Civil No. 11-00268 SOM/RLP; ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT